[Cite as *State v. Bacon*, 2016-Ohio-618.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-14-1112

       Appellee                          Trial Court No. CR0201203141

v.

Amanda Bacon                           **DECISION AND JUDGMENT**

       Appellant                         Decided: February 19, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Thomas P. Kurt, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas, following a jury trial, in which appellant, Amanda Bacon, was found guilty of one

count of murder, in violation of R.C. 2903.02(B) and (D), and one count of child

endangering in violation of R.C. 2919.22(B)(1), (E)(1), and (E)(2)(d).  The undisputed,

relevant facts are as follows.

{¶ 2} On December 17, 2012, at approximately 12:30 a.m., appellant and a companion, Frank Jones, took appellant's infant son, Avery, to the emergency room at St. Anne's Hospital in Toledo, Ohio. Avery, who was six months old at the time, was not conscious. His head was swollen, he had purple spots behind his ears, his pupils were dilated, and his core body temperature was 93 degrees. Upon examination, ER doctors discovered that Avery's skull had been fractured. Appellant told medical personnel at St. Anne's that the child had fallen off the bed at her apartment, which she shared with Jones. Police were called to the hospital to interview appellant and Jones, who gave differing and, at times, conflicting accounts of how Avery was injured.

{¶ 3} Because St. Anne's was not equipped to handle Avery's injuries, he was transferred to St. Vincent's hospital. Appellant was taken to St. Vincent's in a police cruiser, where she and Jones were questioned by Toledo Police Detectives Ashley Nichols and Kermit Quinn. Based on the detectives' assessment of appellant's conflicting statements and their belief that Jones' answers were "evasive," both appellant and Jones were taken to Toledo police headquarters for more extensive interviews. Appellant was interviewed multiple times by three different detectives over a five and one-half to six-hour time span. Jones was interviewed separately for a shorter period of time. While appellant was being interviewed, Avery was transported to Mott Children's Hospital in Ann Arbor, Michigan, where he died on December 18, 2012.

{¶ 4} On December 27, 2012, a Lucas County Grand Jury indicted appellant on one count of murder, in violation of R.C. 2903.02(B) and (D) and 2929.02, and one count

2.

of child endangering, in violation of R.C. 2919.22(B)(1) and (E)(2)(d) [trial court case No. CR0201203141]. On February 13, 2013, a second indictment was issued which charged appellant with one count of aggravated murder, in violation of R.C. 2903.02(C) and (F) [trial court case No. CR0201301265].[1] Appellant entered a not guilty plea to the charges.

{¶ 5} On December 23, 2013, the state filed a motion in limine pursuant to Evid.R. 609, in which it asked the trial court to prohibit the defense from introducing evidence at trial of Jones' prior convictions for impersonating a police officer and sexual assault. The trial court granted the motion in limine on January 14, 2014. On March 27, 2014, the state filed a second motion in limine, in which it asked the trial court to exclude "the use of any conviction not meeting the eligibility requirements of Evid.R. 609(B) because the prejudicial value is not outweighed by the probative value of the conviction." On April 3, 2014, a hearing was held at which the state's second motion in limine was discussed and, on April 4, 2014, the trial court issued an order in which it was granted.

{¶ 6} A jury trial began on April 8, 2014. At the start of the proceedings, the defense made an oral motion to limit the testimony of a potential prosecution witness, David Skrepenski. In support, the defense argued that Skrepenski had limited contact with Avery and appellant because he was incarcerated in October 2012. The defense also argued that Skrepenski, a drug user, should be prohibited from testifying that appellant

---

[1] The two indictments were later consolidated for purposes of trial.

3.

used drugs, and that Skrepenski's testimony could be improperly used against appellant to support the charge of child endangerment. After hearing arguments by both sides, the trial court found the motion not well-taken and denied it, but stated that the defense could object to other specific lines of questioning during Skrepenski's testimony.

{¶ 7} At trial, the state presented testimony by physician's assistant Rachel Mutchler, Kevin Martin, M.D., Patrick McCormick, M.D., Toledo Police Sergeants Thomas La Forge, Ashley Nichols, Sherri Wise, Terry Cousino, William Jay Gast, Toledo Police Officers Valerie Lewis and Mark Johnson, and Toledo Police Detectives Eugene Kutz and Kermit Quinn. Other state witnesses were Percy Pegues, Martin Nalley, Frank Jones, David Skrepenski, Jeffrey Jentzen, and Captain John Sylvester of the Lucas County Sheriff's Office.

{¶ 8} Mutchler testified that Avery's head was "wider" than normal when appellant and Jones brought him into St. Anne's. She said that appellant's pupils were smaller than normal for the dimly lit emergency room, and that appellant appeared nervous and was unable to provide Mutchler with basic information such as Avery's weight and vaccinations. Mutchler also said that, at first, appellant said that Avery must have fallen off of the bed when she went into the bathroom; however, appellant later stated she put Avery on the floor while she went to the bathroom and saw that his ears were "bruised" when she returned. Mutchler stated that Avery was not breathing according to an "expected pattern" and he was not awake. He also exhibited "Battle's

4.

sign," a condition marked by bruising around the ears, which is usually associated with significant skull fractures.

{¶ 9} Martin testified that he was the emergency physician on duty at St. Anne's when appellant and Jones brought Avery into the hospital. Martin said that medical personnel were able to get Avery to breathe, however, the child's pupils were dilated and non-reactive to light, and he was not moving. Also, the back of Avery's head felt like a "wet sponge," causing Martin to consider child abuse as a cause of the injuries. Martin stated that Avery had a core temperature of 93 degrees, indicating that he was dying. He also suffered from acute blood loss and abnormal swelling of his head.

{¶ 10} Martin described appellant as "upset * * * but not hysterical" like most mothers in similar situations. He stated that medical records from Bay Park hospital, where Avery was treated on September 15, 2012, showed the child was treated for colic, an illness which usually causes "a lot of crying" in an infant. On cross-examination, Martin testified that all infants and young children have "sutures" in the skull that allow the brain to grow, as opposed to the type of fractures that Avery suffered.

{¶ 11} McCormick, a pediatric neurosurgeon, testified that an infant's brain has less water content than an adult's, making it more vulnerable to concussion injuries. He also testified that Battle's sign indicates "high force to the skull that fractured the bottom of the skull," and it develops after a head injury occurs. McCormick said that there was no need for neurological intervention in Avery's case because his injuries were so severe that his deep brain structures had lost their function, making him essentially "brain dead"

5.

by the time he reached the hospital. McCormick also said that Avery's coma was a "3" on the Glasgow coma scale, and that a normal score is a "15." He stated that Avery's fractures look like "an egg that is hit against a flat surface – puzzle pieces," and that the force necessary to produce such an injury was "massive." He then demonstrated the type of force necessary to produce Avery's injury by using a doll.

{¶ 12} McCormick testified that Avery's injuries could not have resulted from hitting a coffee table or falling off a bed, or even from an adult smashing his body against a wall. However, it could have been made by swinging a child and causing him or her to hit a hard, flat surface such as a carpeted concrete floor. He further testified that Avery suffered "axonal injury," which indicated that his brain was moving when his head hit the surface, and that the impact caused a shearing force that broke the nerve axons and also caused hemorrhaging around his eyes. McCormick opined that, if Avery's Battle's sign was first noticed at 10:36 p.m., his injury would have occurred between 7:30 and 9:30 p.m. McCormick testified on cross-examination that he saw Avery at St. Vincent's hospital, and he transferred the child to Ann Arbor at the family's request, however, it was obvious to him "that the brain injuries were probably irreparable."

{¶ 13} Sergeant LaForge testified that he was called to St. Anne's hospital on December 17, 2012, where he spoke to Mutchler and also met with appellant and Jones in the waiting room. LaForge said that appellant told him she left the bed where she was sleeping with Avery to go to the bathroom. When she returned, the child was on the floor, and had a bump on his head and purple ears. Appellant also said that she may have

6.

put the child on the floor before leaving the room. Appellant insisted that, before he was injured Avery, who was six months old, was crawling around on his own. LaForge said that he interviewed Jones, who denied knowing what had happened. Jones told LaForge the injury occurred at his apartment, after which LaForge called for officers to go there.

{¶ 14} Officer Lewis testified that she was assigned to transport appellant from St. Anne's to St. Vincent's hospital. While at St. Anne's, she overheard appellant saying she left Avery alone for a couple of minutes to go to the bathroom and that, when she came back to the bedroom, he was unresponsive and had blue ears. Lewis also testified that, later, she heard appellant say she left Avery with milk, juice and a blanket on the floor while she went to a gas station for ten minutes. Upon her return, he had blue ears, and Jones said he was asleep. Lewis also heard appellant say that Avery was learning to walk and climbing on furniture. Lewis said that, during the three or four hours she had contact with appellant, she observed appellant texting and talking on her cell phone. She also said she saw appellant cry when Avery's father came to St. Vincent's, and she heard appellant tell Avery's father she did not know why "he [Jones] would do this."

{¶ 15} Detective Kutz testified that he was at St. Vincent's on another assignment when he heard appellant say she left Avery for seven minutes to go across the street for cigarettes, and came back to find her roommate sleeping and Avery with swelling on his head and purple ears. Kutz further testified that, later, he went to Jones' apartment to execute a search warrant. He also drew up requests to view videos from the Marathon and Sunoco gas stations near Jones' apartment, as well as the nearby China King

7.

restaurant, to verify appellant's and Jones' accounts of their whereabouts the day Avery was injured. He did not know if a request was made for surveillance video from a nearby McDonald's, where appellant said that she purchased food on December 16. He stated that his report listed appellant and Jones as possible suspects.

{¶ 16} Sergeant Nichols testified that Avery appeared lifeless and was not crying when she first saw him at St. Vincent's at 1:30 a.m. on December 17, 2012. Nichols, who interviewed appellant, said that appellant appeared upset and looked "unkempt," but was not crying. Nichols further testified that appellant told her she left Jones' apartment to go to the Marathon station for cigarettes around midnight. Seven to ten minutes later, she came back and noticed a lump on Avery's head. Jones said he was asleep and did not know what happened.

{¶ 17} Detective Wise testified that she went to St. Vincent's to interview appellant, who told her that she did not know how Avery was injured, and that she was a good mother who never hit her child. Wise further testified that appellant said she left Avery with Jones for a short time so she could get cigarettes. However, Wise also said that, while at St. Anne's, appellant told a different story to Lewis. Wise said that she also spoke to Avery's father, Jeremy Glynn, who had not seen his son in a month.

{¶ 18} Wise stated that later that morning she interviewed Percy Pegues, who said he was a "client" of appellant. Pegues told Wise that he picked appellant up around 10:45 p.m. on December 16, had sex with her, and returned her to her apartment around 11:30 p.m. Wise also stated that Pegues said that before he had sex with appellant, she

8.

said her sister was going to take her child to the hospital, but it "wasn't anything serious." Wise said that Pegues admitted he paid appellant $60 for the sexual encounter.

{¶ 19} Detective Cousino testified that he took photos of Avery while the child was at St. Vincent's. He noted that the baby had an abnormally large head for a child his age, and that his ears were bruised. Cousino also stated that he helped execute a search warrant at Jones' apartment, where he and other officers observed the crime scene, made notes, took photos, and looked for evidence of anything that could have caused Avery's injuries. Cousino stated that the search was difficult because Avery did not bleed as a result of his injuries. He said fingerprints were not collected. Cousino's photos of the premises showed that there was no crib or bassinet, and no food in the refrigerator, freezer or cupboards. Photos also showed a small stain on the bedroom wall, which testing later revealed was not human blood. Cousino said that, other than a can of formula on the counter, there was no other food in the apartment. He noted that the bedroom had a cinderblock wall with a plaster finish, and the concrete floor was covered with carpet in some places and linoleum in others. Cousino also said that he did not find any McDonald's wrappers or cups in the apartment.

{¶ 20} Pegues testified that he knew appellant as a prostitute named "Brittany" and that he paid her $40 - $60 per hour for sexual encounters. Pegues also testified that on December 16, 2012, he told appellant he would pick her up at 9:30 p.m. When he eventually picked appellant up at 10:40 p.m., she said her baby was sick, but "it's nothing serious." Pegues stated that he and appellant went to a gas station for condoms and

9.

cigarettes, after which they went to the Happy Days motel in Michigan. Pegues also said that he took appellant home shortly before midnight, and he received a call the next day to come downtown for an interview. It was there that he learned from police that appellant's name was not Brittany.

{¶ 21} On cross-examination, Pegues testified that he may have made more than one attempt to contact appellant on December 16. He said that appellant initially told him her baby had a cold and that her sister would take him to the hospital. He also said that appellant "may have" received some texts messages while they were at the motel. He expressed surprise at the allegations against appellant. Pegues stated that he did not know who owned the cell phone that appellant was using, and that the phone's voicemail message was recorded by a male.

{¶ 22} Nalley testified that he was one of appellant's clients, and that he also knew her as "Brittany." Nalley said that he paid appellant for sex on two occasions, however, when she texted him on December 16, 2012, he declined to meet her because he had no money. He also said that appellant texted "sorry, my son's in bad shape right now, I'll text you in a few," to which Nalley responded "I hope he's okay." Nalley testified that appellant said "I do not know. His head is starting to swell up and his ears are turning purple. I left for five minutes and I don't know if my sister put her hands on him or what. I'm freaking out." Nalley further testified that appellant told him both of the baby's ears were blue and his head was "kind of mushy." Nalley said that appellant refused his offer of a ride to the hospital. On cross-examination, Nalley testified that he went to St.

10.

Vincent's after texting appellant, and he saw her leave with police officers while he was sitting in his car in the parking lot.

{¶ 23} Jones testified that, before living with appellant, he lived with Peggy Monroe, who falsely accused him of assaulting her young son, Zacariah. Jones also testified that he and appellant lived together previously, broke up for a few years, and then began living together again after Avery was born. Jones stated that appellant is a prostitute, and that he allows her to share the apartment rent-free in exchange for sex. He also said there is never much food, baby formula or baby supplies in the apartment, appellant does not have her own cell phone or car, and Avery slept with appellant or in a car seat because he did not have a crib to sleep in.

{¶ 24} Jones testified that he woke up at 12:30 p.m. on Sunday, December 16, 2012, while appellant and Avery were still asleep. Jones further testified that he went to Top Shotz bar on Alexis Road and Lewis Avenue, where he stayed until 7:00 p.m. He then went to Brew Ha's on nearby Detroit Avenue, however, he did not drink there. Jones stated that, after Brew Ha's, he went to nearby China King restaurant and ordered take-out chicken, which he took to a strip club on Alexis and Telegraph Road. At 8:00 p.m. he left the strip club and called his brother on his cell phone. Jones said that appellant and Avery were alone in his apartment the entire time that he was gone. At that point, the state renewed its objection to the introduction of Jones' prior convictions for sexual offenses and impersonation of a police officer, which the trial court sustained. Jones' testimony then resumed.

11.

**{¶ 25}** Jones testified that, when he returned home that night, he heard screaming and "seen [sic] the baby leave her [appellant's] hand." He also said that it was appellant who was screaming, not Avery. Jones stated that he picked up the baby, who was not making any noise, from the floor and put him in a car seat. Jones said that, after appellant left the apartment, he took Avery to Kroger to purchase some chicken. He also said that, around 11:00 p.m., while he was at Kroger, he noticed the baby's head was swollen. He then called appellant and told her to return immediately and take Avery to the hospital. Jones stated that, when appellant returned to the apartment "[s]he was all cheery" and said "Let's go." However, in the car on the way to the hospital, appellant said "I fucked up Frank. I fucked up."

**{¶ 26}** Jones denied putting any water on Avery's head. He admitted that he was not completely honest with police officers at the hospital, because he did not want appellant to "get hurt." Jones testified that, on January 12, 2013, a white man who claimed to be a "State Attorney General" spoke to him at his home and asked him to testify that he pushed appellant, causing her to fall against the wall and drop Avery onto the floor. Jones said that, after talking to a lawyer, he found out that the man was an imposter.

**{¶ 27}** On cross-examination, Jones testified that he lied to Detectives Quinn and Gast at St. Vincent's, however, he later told the truth to Detectives Snyder and Quinn. He said he did not remember going to McDonald's on December 16. He did remember that appellant took his cell phone when she left the apartment around 8:30 p.m.

12.

{¶ 28} Officer Johnson, who was assigned to the Toledo Police Department's video unit in 2012, testified that he reviewed the Sunoco station's video for the hours between 10:00 p.m. on December 16 and 12:00 a.m. on December 17, 2012, but he did not see appellant on the video. He also testified that China King did not have a video surveillance system, and video from the Marathon station that was recorded between 10:00 p.m. and midnight did not contain images of appellant. However, video from Kroger taken on December 16 at 11:00 p.m. showed Jones with Avery, who was riding in his car seat in a shopping cart.

{¶ 29} At the close of Johnson's testimony the defense renewed its motion to prevent Skrepenski from testifying, which the trial court denied. Skrepenski then testified that he and his wife, Teresa, met appellant in the summer of 2012, when Avery was two months old. Skrepenski stated that they purchased food for Avery and his brother, Aiden, because the boys had not eaten that day. He further stated that, right after he and his wife met appellant, she asked the couple to watch her children while she worked as a dancer at a local strip club. However, she did not give them any food, toys or other supplies during the two days that the boys were in the couple's care. Skrepenski also said that, later, appellant asked the couple to care for Avery for two weeks while she took Aiden to see his father in New York. However, appellant did not return until approximately one month later, in mid-September. During that time the Skrepenskis purchased diapers, food, toys, a crib, and other items for Avery and even took him to Bay Park Hospital where he received vaccinations, an antibiotic and medicine for colic.

13.

**{¶ 30}** Skrepenski testified that they returned Avery to appellant in late September or early October and that, by that time, they had become attached to the child. The next weekend, appellant again asked them to watch Avery for two more weeks. One week after returning him for the second time, appellant called and asked them to pick Avery up in Detroit, which they did. Skrepenski stated that, this time, Avery appeared "drowsy" and there was a purple-colored substance that appeared to be Tylenol inserted into his pacifier. At that time, appellant's apartment contained none of the items or supplies the Skrepenskis had purchased for Avery. Skrepenski further stated that he and his wife saw Avery for the last time when appellant called and asked them to take the boy to be with his father.

**{¶ 31}** Skrepenski testified that he was arrested on October 29, 2012, and charged with theft and burglary, and that he heard about Avery's death through his wife, Teresa, while he was in the Wood County Jail. Skrepenski also testified that he communicated with Teresa from jail by either text or telephone, and that Teresa died of a drug overdose after learning about Avery's death. On cross-examination, Skrepenski stated that, while he was in jail, he told his wife that he is a drug addict. However, he stated that he is not really an addict, and that he lied because he wanted to get out of jail to attend a drug treatment program. Skrepenski further stated that he is serving an eight-year prison term, and that he was not promised anything in exchange for his testimony.

**{¶ 32}** Detective Gast testified that he was assigned to analyze the text messages and call records on each of Jones' cell phones between August 2012 and December 17,

2012, to see if they were connected to Pegues, Nalley, Teresa Skrepenski, and several other individuals. He stated that Jones began using the phone that appellant had access to in November 2012. Gast explained that cell phones "ping" off of surrounding cell phone towers, based on the strength and the quality of the service provider, the network, and the device. He said that, typically, in Toledo, the signal is within two or three miles of a tower. He also said that moving a cell phone only 10 feet could cause its signal to "jump" a to different tower.

{¶ 33} Gast said that, on December 16, 2012, activity on the cell phone used by appellant showed that it was near the Happy Days motel at 11:00 p.m., and on December 17, 2012, it was near Jones' apartment at 12:49 a.m. and St. Anne's hospital at 1:32 a.m. He said that the phone showed multiple calls and texts to Pegues on the evening of December 16. He also said that, based on the calls made, Jones had possession of the cell phone until 8:30 p.m. The next text was made at 9:41 p.m. when appellant attempted to contact a client, Otis Byrd.

{¶ 34} Gast said that a text was sent at 10:36 p.m. to appellant's boyfriend, Don Wells, in which she said "there is something wrong with my baby. His head is swelling up and his ears are turning purple. I don't know what happened. Taking him to ER. I am freaking out." At 11:12 p.m., appellant texted Nalley to say that the baby's head was swelling and his ears were blue and "I left for five minutes and I don't know if my sister put her hand on him or what. I'm freaking out." Later, at 3:32 a.m. on December 17, appellant again texted Wells and told him that "my son is in the hospital fighting for his

15.

life. They don't think he's going to make it. I need you." Based on the numbers called and the content of the text messages, Gast opined that the cell phone was transferred from Jones to appellant "somewhere between 8:16:59 and 8:50:39 p.m." on December 16, 2012. However, on cross-examination, Gast testified that cell phone records are not "geared" to law enforcement purposes and are, at times incomplete or inconsistent.

{¶ 35} Jentzen testified that he is a professor of pathology at the University of Michigan, and he is also a medical examiner and an expert on shaken baby syndrome. Jentzen said that he performed an autopsy on Avery, on December 18, 2012. During the autopsy, he noted swelling around Avery's eyes that indicated fractures of the skull, bruises to the sacrum and lower back, and there was a "linear pattern" of bruising and a "prominent purplish discoloration which is hemorrhage" on the child's head. Jentzen also testified that there was a "laceration type injury to the top portion of the left ear," which could have been caused by a fingernail, or could have been made when the child was either held or suspended by the ears. He noted no retinal hemorrhage in either eye, but said there was extensive hemorrhaging around the optic nerves. He said the injuries were caused by torsion—a "whiplash-type action" and blunt force trauma.

{¶ 36} Jentzen stated that Avery had a large fracture on the rear of his head that extended from his left ear, around the base of his skull, to the right frontal portion of the skull, and three fracture lines of the left side of his head showing "where the skull was actually pushed in and caused fracturing in that area." He also stated that a fracture line on the right side of Avery's head was caused after the one on the left side. Jentzen

16.

testified that the fracture lines crossed the sutures in Avery's head, indicating a "large amount of force," and there was expansion of the fracture lines due to brain swelling. He also said that there was a V-shaped fracture at the soft spot on the top of Avery's head where "the suture lines are actually pulling apart from the injured brain." He described the injury as a comminuted fracture made up of multiple patterned, open and moveable fragments.

{¶ 37} Jentzen also said that Avery suffered diffuse axonal injuries, where the nerve fibers in his brain were stretched and torn, and "little circular beads of material [were] coming out of the nerve fibers." Jentzen opined that Avery was not conscious after the first impact. He characterized Avery's death as "a purposeful homicide," due to fractures that were caused by "monumental, severe, blunt force trauma." On cross-examination, Jentzen testified that the effect of the first impact would have been immediate loss of consciousness. Secondarily, Avery could have experienced seizure activity, convulsions, gasping and apnea until his brain swelled enough to stop his breathing "minutes to hours" after the injury.

{¶ 38} Sylvester testified that he is in charge of the Lucas County inmate phone system, which records all calls made by inmates. He testified that appellant made "hundreds" of calls from jail between January 2013 and January 2014. Several clips from those recorded calls were played for the jury.

{¶ 39} Quinn testified that he interviewed appellant on December 17, 2012. He said that suspects such as appellant often distance themselves from the crime by using

17.

"forced politeness" and referring to the interviewer as "sir." Quinn said that he interviewed appellant at St. Vincent's hospital, where she said that she saw Jones holding Avery and sprinkling water on him when she returned to the apartment on December 16. She also told Quinn that the child's head was swollen and his ears were purple at that time. At the time of that interview appellant was not a suspect, but Quinn also said that he first interviewed Jones at 4:30 a.m. on December 17, 2012, and, based on appellant's statements, Jones was a suspect at that time. Quinn stated that, based on his experience, Jones was not under the influence of alcohol or drugs during that interview.

{¶ 40} Quinn testified that he interviewed appellant at the police station several times, beginning at around 5:15 a.m. Those interviews, which ultimately spanned more than five hours, were recorded and later reduced to approximately two and one-half hours for the trial. Quinn further testified that appellant did not appear to be under the influence of alcohol or drugs at the time, and she signed a written waiver of her *Miranda* rights. He said that, during some of the redacted portions of the interview, appellant was heard crying and praying when she was left alone in the interview room. The redacted interview recordings were played for the jury.

{¶ 41} After the tapes were played, Quinn testified that four inoperable cell phones were found in Jones' apartment. He also testified that there was a stain on the bedroom wall that appeared to be blood, but testing showed that it was not human blood. Quinn said there was a soda cup on the table, but he did not think it came from McDonald's. He said there were no food wrappers in the trash. Quinn stated that some

18.

of Jones' statements to police were later corroborated however, they could not verify appellant's statements. Quinn further stated that Jones was the first suspect, not appellant.

{¶ 42} On cross-examination, Quinn testified that Nichols summoned him to St. Vincent's hospital, and told him that Avery's injuries were "of a suspicious nature" and were not consistent with appellant's account of events. He also testified that, sometimes, the identity of a suspect changes during an investigation and, at one point, he did not think that either appellant or Jones was telling the truth. For example, Jones was "evasive" while being questioned and even walked out of the interview at one point, while appellant often talked over the investigator. Also, he said that Jones originally lied about who had the cell phone on December 16, 2012, and said that he got back at 11:30 p.m., which he later changed to 8:30 p.m. to match appellant's account. He said that, when asked if he wanted to be a witness or a defendant, Jones chose to be a witness.

{¶ 43} Quinn said that he spoke to Jones about his conversation with someone from the Attorney General's office, but he did not verify the identity of that person. Quinn testified that the affidavit used to obtain a warrant to search Jones' apartment erroneously stated that there was blood on the wall however, the mistake was not intentional. Quinn also said that appellant prayed "please forgive me" when she was left alone in the interrogation room, but she never admitted to hurting Avery. He said that he thought appellant was "fake crying" during the interview. He stated that appellant was interviewed four separate times between 5:12 a.m. and 8:33 p.m. on December 17, and

19.

Jones was interviewed three times over the course of three hours. During that time, Jones said that appellant stated "I fucked up." Quinn also stated that Jones was not charged with a crime because his story was verified by the cell phone records and video surveillance tapes, while appellant's story could not be verified, except for her story about Pegues.

{¶ 44} At the close of Quinn's testimony, the state rested. The defense then presented testimony by Peggy Monroe, Nakita Newsome, and appellant.

{¶ 45} Monroe testified that she is Jones' former girlfriend and the mother of two of his children, and that she lived with Jones for almost two years. Monroe also testified that, in September 2003, Jones got violent, jumped on her and threw her one-year-old son Zach against a dresser. Monroe said that she took Zach to the hospital the next day because he could not move his arm, and she lied about Jones hurting the boy because she was afraid to tell the truth. Monroe also said that Jones' brother forced her to sign a letter addressed to the prosecutor saying that Jones did not hurt Zach. Monroe said that she eventually left the Toledo area because she was afraid of Jones.

{¶ 46} On cross-examination, Monroe stated that she falsely accused several men of sexually assaulting her in the past, and that she had "multiple dealings" with the Children's Services Board in Toledo and also in several other states. When questioned, Monroe could not easily remember Zach's birth year or her daughter Malia's age. She also said that she previously admitted to having "anger management issues" and said that two of her children were taken away in Florida due to abuse and mental health issues.

20.

Monroe said that Jones is the father of two of her children. On redirect, Monroe said she only admitted to anger management issues to regain custody of her children. Monroe also said that felony charges are pending against her because she returned to Toledo to testify against Jones.

{¶ 47} Nakita Newsom testified that she met appellant through a mutual friend, and that appellant lived with her in Detroit after Avery was born. Newsom said that she helped appellant care for Avery while appellant worked at a club as a dancer. She said that Avery was a happy baby and, although he did not have his own room, appellant did provide clothes, food and supplies to take care of him. Newsom also said that appellant moved out of her apartment in November 2012, and she did not see Avery after that. She described appellant as a "good parent" who did not abuse her son. She said that Teresa Skrepenski often took care of Avery on weekends.

{¶ 48} On cross-examination by the state, Newsom testified that appellant and Avery left before Thanksgiving. She did not recall telling the Skrepenskis that appellant often left Avery for days at a time, or that she sometimes put Kool-Aid in Avery's bottle. Newsom said that the Skrepenksis sometimes left diapers, wipes and formula for Avery when they brought him back to appellant. She denied having any knowledge of Avery's injuries on December 16, 2012.

{¶ 49} Appellant testified on her own behalf at trial. Appellant stated that her oldest son, Aiden, lives with his father in New York, and that she met Jones in 2011, when she was pregnant with Avery, as she was walking down the street. Appellant also

said that she began prostituting herself while she lived with Jones. However, she moved out of Jones' apartment in December 2011, and eventually wound up living with Newsom in Detroit. Appellant said that she gave birth to Avery in New York and then returned to Toledo to live with Avery's father until August 2012, when she gave Avery to Teresa Skrepenski and went back to New York for a time. After returning for Avery, she moved back in with Newsom and worked at the Cobra Club.

{¶ 50} Appellant said that, after leaving Newsom's apartment in November 2012, she moved in with Avery's father for a few weeks but, because he was abusive and took illegal drugs, she moved out and went back to live with Jones. She stated that Jones did not want her to work nights at the club because he did not want to babysit Avery, so she began prostituting herself again.

{¶ 51} As to events on December 16, 2012, appellant testified that she and Avery were alone all day with no phone, no food and no money, until Jones returned at 8:30 p.m. Appellant said that Jones took her and Avery to McDonalds, where she purchased a double cheeseburger, fries and a coke, after which they went home. Appellant said that, at home, she gave Avery a bottle of formula, followed by a bottle of soda mixed with water, and left him on the floor playing with his toys while she went for a walk on Alexis road "to make money." Appellant said that, while walking, she used Jones' cell phone to call several potential clients, including Pegues and Nalley. She also texted her boyfriend, Don Wells. Appellant further said that she returned to the apartment at 10:10 p.m. and knocked on the door because she did not have a key. When Jones let her into the

22.

apartment, she heard Avery crying in the bedroom. Appellant said that she saw that Avery had a bump on his head, which was swollen, and bruising in his ear. Appellant stated that she initially did not want to take the baby to the hospital because there was an outstanding warrant for her arrest. Later, appellant said she asked Jones to take Avery to the hospital, but he said the trip was not necessary.

{¶ 52} Appellant testified that she met Pegues at approximately 10:30 p.m., and they went to the Sunoco station for condoms and cigarettes, followed by a trip to the Happy Days motel for sex. Appellant also testified that she told Pegues about Avery's injury when he picked her up, and told him that her sister was going to take the baby to the hospital. Appellant said that Jones called her around 11:00 p.m. to tell her that he was at Kroger with Avery, and that the baby was "OK." She said she left the motel at 11:40 p.m. and went home. Appellant also said she had to pound on the apartment door, which was locked. When Jones opened the door, he was holding Avery in his arms and putting water on him. Appellant said the baby's head was swollen, he was not breathing, and his body was "turning colors." Appellant stated that Jones told her he did not know what happened to Avery. After dressing the child, she and Jones took him to St. Anne's hospital.

{¶ 53} Appellant said that Jones told her to lie to the doctors at St. Anne's because of her outstanding warrant, so she said that Avery had fallen off of the bed after she left to purchase cigarettes. Appellant also said that she was taken to the police station for questioning after Avery was transferred to St. Vincent's hospital, and that she was

23.

interviewed for a long time. During that interview, she received a call from the hospital informing her that Avery probably would not recover from his injuries, and asking her about organ donation. She later found out that Avery had died.

{¶ 54} On cross-examination appellant testified that, before living with Jones, she worked at strip clubs as a dancer and a shot girl. She admitted lying about her sister taking Avery to the hospital and telling Pegues that Avery's injuries were "not bad." She also admitted that she falsely told Nalley that her sister "must have put her hands on" Avery, and that she lied to Martin, Mutchler, LaForge and Lewis when she said that Avery fell off the bed while she was in the bathroom. Appellant said that she texted Nalley at 11:02 p.m. that Avery "may have a concussion to his head" and, later she texted that "his head is kind of mush also." Appellant said that she referred to Avery by name only twice during the police interview because she usually called him "my baby" or "my son." Appellant also said that she told police she is not "the best" mother, but she never said she was not a good mother, and she did not ask to see her child when she knew he was dying because she did not believe she would be allowed to see him.

{¶ 55} Appellant said that she often gave both of her boys a mix of Kool-Aid and water or soda and water, even when formula was available. Appellant also said that she allowed the Skrepenskis to care for Avery for a month while she went to New York because there was no one else available to care for the baby. She denied taking a walk on December 16 to establish an alibi, and said that she did not know that Avery was dying at the same time that she was having sex with Pegues.

{¶ 56} Spitz, a board certified forensic pathologist, testified that he reviewed Avery's records before trial and, in his opinion, Avery suffered two blows to the head that were inflicted within a short period of time. Spitz said that the first impact would have been so severe that Avery would not have cried, and that the baby's brain would have swelled quickly. He said that Battle's sign results when the bottom of the skull is broken and the brain is damaged, causing blood to seep out and collect below the ear lobe, making a blue discoloration. He also said that damage is produced in proportion to the severity of the impact, and the first blow was probably fatal in this case. Spitz opined that, by the time Avery arrived at St. Anne's he was blue, his pupils were dilated and non-reactive, he had a slow heartbeat and his body temperature was 93 degrees, all of which indicated that he was probably brain dead. He said that, at that point, there was no benefit to surgical intervention.

{¶ 57} Spitz testified that Battle's sign ordinarily develops no sooner than one to three hours after the primary injury however, in this case, the blow might have been severe enough to change that timeline. Accordingly, for Battle's sign to appear at 10:30 p.m., the injury could have happened as recently as 10:00 p.m. He also said that a CT scan of Avery's brain confirmed that the blows were made by contact with an "unyielding" underlying surface.

{¶ 58} On cross-examination, Spitz testified that Avery had a laceration of his left ear, as if a fingernail had dug into his skin, and fingertip bruises on his back consistent with a "hard grip." He also had comminuted skull fractures, brain swelling, separation of

25.

the sutures of his skull, subarachnoid hemorrhaging, diffuse axonal injury in his brain, and optic nerve hemorrhaging. Spitz said that, in his opinion, the scenario was the "killing of a six-month-old child," and "the head injuries that Avery sustained are of such severity that they would have become noticeable by the child's unresponsiveness after the first impact." Spitz also said that he did not examine Avery's body, but he wrote two reports after reviewing Avery's medical records, one of which was presented at trial. However, his opinion that Avery could not have been conscious when appellant returned home at 11:45 p.m. was inexplicably omitted from that report.

{¶ 59} At the close of Spitz's testimony, Lenhardt testified that he took photos at Jones' apartment, which he searched along with Quinn and Gast. Lenhardt authenticated the photos, which were then entered into evidence. At that point the defense rested, and the jury heard closing arguments by counsel and received instructions from the trial court before retiring to deliberate. After a period of deliberation, the jury found appellant guilty of murder and child endangering, and not guilty of aggravated murder.

{¶ 60} A sentencing hearing was held on April 24, 2014, at which the trial court imposed a mandatory sentence of 15 years to life for murder, to be served concurrently with eight years of imprisonment followed by three years of mandatory postrelease control for child endangerment. The trial court also ordered appellant to pay court costs and fees, explained the consequences of violating the terms of postrelease control to appellant, and notified her of her rights on appeal. A timely notice of appeal was filed from the trial court's judgment on May 21, 2014.

26.

{¶ 61} On appeal appellant sets forth the following five assignments of error:

I. The trial court erred in disallowing the introduction of Frank Jones's prior criminal record.

II. The trial court erred in admitting the testimony of David Skrepenski, which was irrelevant, unfairly prejudicial and inflammatory.

III. The trial court erred in refusing to instruct the jury in accordance with *Burrage v. United States*, ___ U.S. ___, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014).

IV. The trial committed cumulative error by not allowing appellant to establish a full and complete picture of the credibility of the government's witness Frank Jones, and in admitting unfairly prejudicial testimony regarding appellant's character, as argued in Assignment of Error I and Assignment of Error II above.

V. Each of the errors identified in the foregoing assignments of error, individually and cumulatively, violated Ms. Bacon's right to a fair trial guaranteed by the fifth, sixth, and fourteenth amendments to the United States Constitution, and Art. I, §10 of the Ohio Constitution.

{¶ 62} In her first assignment of error, appellant asserts that the trial court abused its discretion by not allowing the defense to impeach Jones' credibility with his prior convictions, which were more than ten years old. In support, appellant argues that, in this case, the probative value of the evidence substantially outweighs any prejudicial effect

that may result from introducing it at trial. Specifically, appellant argues that only appellant or Jones could have fatally injured Avery. Therefore, because the defense was unable to impeach Jones at trial with his prior criminal convictions for sexual assault and impersonating a police officer, the state was given "a free hand" to assassinate appellant's character and paint a picture of her as both bad mother and an "unsavory" person while Jones was falsely portrayed as a "simple man."

{¶ 63} Pursuant to Evid.R. 609(A), felony convictions that were punishable by imprisonment of more than one year, as well as any conviction of a crime that involves dishonesty or a false statement, are admissible at trial to impeach the credibility of a witness. However, pursuant to Evid.R. 609(B), evidence of a conviction that is more than ten years old is not admissible "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

{¶ 64} "Generally, convictions over ten years old rarely should be admitted under Evid.R. 609(B), and only in exceptional circumstances." *Ruff v. Bowden*, 10th Dist. Franklin No. 94APE08-1116, 1995 WL 141045 (Mar. 28, 1995). Nevertheless, a trial court has broad discretion in determining whether or not to admit evidence of a witness's prior convictions pursuant to Evid.R. 609. *State v. Wright*, 48 Ohio St.3d 5, 548 N.E.2d 923 (1990), syllabus. In exercising its discretion, the trial court must consider all relevant factors. *Id.* On appeal, we will not overturn the trial court's discretionary decision absent

28.

a finding that it was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 65} As set forth above, on December 23, 2013, the state filed a motion in limine in which it asked the trial court to preclude the introduction of Frank Jones' 1986 rape conviction pursuant to Evid.R. 609(B). The defense did not file a memorandum in opposition. However, on January 10, 2014, a pretrial hearing was held at which the defense argued that the motion in limine should be denied because Jones was a witness, not a defendant. On January 13, 2014, the trial court found the state's motion well-taken and it was granted.

{¶ 66} On March 27, 2014, the state filed a second motion in limine in which it asked the trial court to preclude the introduction of Jones' 2001 conviction for impersonating a police officer. In support, the state argued that: (1) the conviction was more than 10 years old, (2) as evidence, it was more prejudicial than probative, and (3) the defense did not submit a timely written proffer of its intent to use the evidence at trial. A hearing was held on April 3, 2014, at which the trial court gave the parties an opportunity to present oral arguments concerning the second motion in limine. At that time, the defense stated that it would prefer to respond to the motion in writing. The trial court granted the motion in limine, subject to reconsideration prior to Jones' trial testimony.

{¶ 67} Before Jones testified, the defense renewed its objections to the trial court's previous ruling prohibiting the introduction of Jones' prior conviction for impersonating

29.

a police officer. In support, the defense argued that impersonation of a police officer is a crime of dishonesty that should not be subject to the ten-year limitation in Evid.R. 609(B). Later, during a break in Jones' testimony, the trial court considered appellant's request and renewed its decision to prohibit evidence of Jones' prior convictions from being presented at trial. The defense then preserved its objections for purposes of this appeal.

{¶ 68} The record in this case includes testimony by Monroe and appellant that Jones was capable of violence toward women and children, along with the jury's observation of Jones' demeanor during direct testimony. Accordingly, upon consideration, we cannot find that the trial court abused its discretion by granting the state's motions in limine and excluding evidence of Jones' prior convictions pursuant to Evid.R. 609(B). Appellant's first assignment of error is not well-taken.

{¶ 69} In her second assignment of error, appellant asserts that the trial court erred by denying her motion in limine and allowing David Skrepenski to testify at trial. In support, appellant argues that Skrepenski's testimony was part of the state's attempt to "assassinate" her character by showing that she was a poor mother and therefore was more likely to "commit cold-blooded infanticide." Appellant further argues that Skrepenski's testimony was "devoid of probative value."

{¶ 70} Generally, a trial court has broad discretion to either admit or exclude evidence at trial. *State v. Ott*, 133 Ohio App.3d 532, 534, 729 N.E.2d 391 (9th Dist.1999). "[S]uch determinations should not be disturbed by a reviewing court unless a

clear abuse of discretion has occurred and the appellant has been materially prejudiced by the admission or exclusion." *Id.*, citing *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶ 71} The failure to object to testimony at trial waives all but plain error. *State v. Long*, 53 Ohio St.2d 91, 372 N.W.2d 804 (1978), paragraph one of the syllabus. On appeal, plain error will be found only if the reviewing court, after examining all of the relevant evidence that was properly admitted at trial, determines that an error occurred and that, "but for [such] error, the outcome of the trial clearly would have been otherwise." *Id.* at paragraph two of the syllabus. Pursuant to Crim.R. 52(B), notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 72} On April 8, 2014, the first day of trial, appellant filed a motion in limine in which she asked the trial court to prohibit Skrepenski from testifying for the state. In a memorandum in support, appellant stated that Skrepenski's testimony had no probative value because it would be "cumulative," "irrelevant," and largely based on admissible hearsay statements made by Skrepenski's deceased wife, Teresa. Appellant also argued that Skrepenski's testimony "would mislead the jury as to the issues" presented at trial. The state responded that Skrepenski would testify that appellant did not provide supplies and food for Avery while the child was in the Skrepenskis' care. Before trial, the trial court denied the motion in limine based on appellant's arguments at that time. However,

the court stated that appellant could object to any additional issues that may arise during Skrepenski's testimony.

{¶ 73} At trial, appellant made hearsay objections as to statements made to Skrepenski by Bacon, Teresa Skrepenski and a physician at Bay Park Hospital. Those objections were sustained by the trial court. However, appellant's counsel did not object to Skrepenski's testimony regarding Bacon's failure to supply him and his wife with sufficient money or, alternatively, with food, diapers and toys for Avery, while the child was in their care. Appellant likewise did not object to testimony that the Skrepenskis cared for Avery over relatively long periods of time, or that his pacifier appeared to contain children's Tylenol when the Skrepenskis picked him up from appellant in Detroit.

{¶ 74} On consideration of the foregoing, we find that Skrepenski's trial testimony provided a context for the jury to consider when evaluating appellant's actions on the night Avery was injured. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 72 (Testimony that a parent was generally not attentive to his or her child's basic needs makes a defendant's actions "more understandable to the jurors" and therefore does not constitute plain error.). Accordingly, we cannot say that that the trial court committed plain error or abused its discretion by allowing such testimony. Appellant's second assignment of error is not well-taken.

{¶ 75} In her third assignment of error, appellant asserts that the trial court improperly instructed the jury on causation as to the charge of felony murder, when it stated that "[a] defendant's responsibility *is not limited* to the immediate or most obvious

32.

result of the defendant's act or failure to act. * * *" (Emphasis added.) Instead, appellant argues that the trial court should have told the jury that "a defendant's responsibility *is limited* to the immediate or most obvious result of the defendant's act or failure to act." (Emphasis added.) In support of her argument, appellant relies on *Burrage v. United States*, ___ U.S. ___, 134 S.Ct. 881, 892, 187 L.Ed.2d 715 (2014), in which the United States Supreme Court held that:

> [A]t least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. Section 841 (b)(1)(C) unless such use is a but-for cause of the death or injury.

**{¶ 76}** In *State v. Lillo*, 6th Dist. Huron No. H-10-001, 2010-Ohio-6221, ¶ 15, this court held that:

> Generally, requested jury instructions should be given if they are a correct statement of the law as applied to the facts in a given case. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585 (1991). A court's instructions to a jury "should be addressed to the actual issues in the case as posited by the evidence and the pleadings." *State v. Guster*, 66 Ohio St.2d 266, 271 (1981). Prejudicial error is found where, in a criminal case, a court refuses to give an instruction that is pertinent to the case, states the law correctly,

33.

and is not covered by the general charge. *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992).

{¶ 77} On appeal, the standard of review for disputed jury instructions is abuse of discretion. Id., citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). An abuse of discretion connotes more than a mere error of law or judgment, instead requiring a finding that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 78} In order to properly analyze appellant's argument, we must first review the relevant aspects of *Burrage v. United States*. In that case, Marcus Burrage sold heroin to a long-time drug user, Joshua Banka, who used the heroin along with several other drugs and subsequently died. Burrage was later indicted for the federal crime of distributing heroin in violation of 21 U.S.C. Section 841(a)(1). Burrage was also charged with causing a death as a result of distributing heroin, which carries a 20-year mandatory minimum prison sentence pursuant to 21 U.S.C. Section 841(b)(1)(C).

{¶ 79} Burrage entered a not guilty plea. At trial, medical experts testified that the additional drugs in Banka's system could have caused his death even if he had not ingested the heroin he bought from Burrage. Nevertheless, Burrage was convicted and the conviction was upheld by the Eighth Circuit Court of Appeals. The case was then appealed to the United States Supreme Court.

{¶ 80} On appeal, the government proposed that the proper test to determine Burrage's liability should be whether the heroin he sold was part of an aggregate force

that contributed to Banka's death. However, the United States Supreme Court ultimately rejected the government's argument in favor of the more traditional "but-for" test, under which Burrage's conduct would be the cause of Banka's death only if Banka died as a direct result of ingesting the heroin.

{¶ 81} In contrast, in this case, appellant was convicted of murder in violation of R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is felony of the first or second degree * * *."

{¶ 82} The underlying crime of which appellant was convicted is felony child endangering, pursuant to R.C. 2919.22(B)(1), which states that no person shall abuse a child under 18 years of age. Pursuant to R.C. 2919.22(E)(1) and (E)(2)(d), child endangerment resulting in serious physical harm to a child is a felony of the second degree.

{¶ 83} As to the necessary burden of proof, the Ohio Supreme Court has held that, in order to convict a defendant of child endangerment, the prosecution must show proof that the act of abuse was committed recklessly. *State v. McGee*, 79 Ohio St.3d 193, 195, 680 N.E.2d 975 (1997). In addition, for a defendant to be found guilty of felony murder based on the underlying crime of child endangerment, the jury must find that the defendant either knowingly caused serious physical harm to the victim, or recklessly abused the victim such that "the abuse proximately caused [the victim's] death." *State v. Irwin*, 4th Dist. Hocking Nos. 03CA13, 03CA14, 2004-Ohio-1129, ¶ 18. Proximate

35.

cause has been defined as "'a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.'" *State v. Burt*, 8th Dist. Cuyahoga No. 99097, 2013-Ohio-3525, ¶ 23, quoting *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, ¶ 26-27.

{¶ 84} In attacking the use of the jury instruction given by the trial court, appellant reasons that the phrase "not limited to the immediate or most obvious result" violates the reasoning expressed in *Burrage*, i.e., that the underlying offense cannot support a penalty enhancement unless the trier of fact determines that death would not have resulted but-for the prohibited conduct. However, appellant's argument ignores the fact that, in *Burrage*, there were multiple contributing factors to Banka's death, which caused the United States Supreme Court to focus its analysis on whether Banka died solely from using heroin, thus triggering the penalty enhancement provision of 21 U.S.C. Section 841(b)(1)(C). In contrast, in this case, expert testimony established that Avery suffered an initial blow to his head that was sufficient, by itself, to cause his death. The method of causation was not in question. Accordingly, the only relevant question to be answered by the jury was who killed baby Avery. After hearing the evidence presented at trial, the jury concluded that appellant was guilty of felony murder as charged in the indictment.

{¶ 85} On consideration of the foregoing, we find the reasoning expressed in *Burrage* is inapplicable to the facts presented in this case. Accordingly, the jury

instruction given by the trial court was not overly prejudicial to appellant and did not otherwise constitute an abuse of discretion. Appellant's third assignment of error is not well-taken.

{¶ 86} In her fourth assignment of error, appellant argues that cumulative errors in the trial court prohibited her from establishing that Jones was not a credible witness, and also unfairly prejudiced the jury. Similarly, in her fifth assignment of error, appellant argues that the trial court's errors, individually and cumulatively, deprived her of her right to a fair trial under both the Ohio Constitution and the United States Constitution. We will consider these two assignments of error together.

{¶ 87} This court has recognized that, in some cases errors may exist that, while not prejudicial in themselves may, "deprive a defendant of a fair trial and may warrant the reversal of his conviction" when considered along with other errors in the proceeding. *State v. Hemsley.* 6th Dist. Williams No. WM-02-010, 2003-Ohio-5192, ¶ 32, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. However, we need not consider whether a defendant was prejudiced by "cumulative error" where no error by the trial court exists. *State v. Henry*, 6th Dist. Lucas No. L-11-1157, 2012-Ohio-5552, ¶ 68.

{¶ 88} On consideration of the entire record that was before the trial court and our determinations as to appellant's first three assignments of error, we find no instances of

37.

singular or multiple errors, harmless or otherwise. Accordingly, no cumulative error exists, and appellant's fourth and fifth assignments of error are not well-taken.

{¶ 89} The judgment of the Lucas County Court of Common Pleas is affirmed. Costs are assessed to appellant pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.               _____

                                             JUDGE

Thomas J. Osowik, J.        

                                             _____

Stephen A. Yarbrough, J.                                    JUDGE
CONCUR.

                                             _____
                                             JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.